## ENDELMAN v. PALMER et al.

District Court, S. D. New York.

March 14, 1946.

Cohen & Neustein, of New York City (Charles A. Cohen, of New York City, of counsel), for plaintiff.

Edward R. Brumley, of New York City (Kenneth B. Morton, of Scarsdale, of counsel), for defendants.

MOSCOWITZ, District Judge.

After the parties rested defendants made a motion for a directed verdict in their favor. The Court reserved decision upon the motion and submitted the issues of fact to the jury. The jury disagreed. Consideration has been given to the motion for a directed verdict.

Harry Endelman was killed on track 9 at New Haven, Connecticut, by a freight train operated by the defendants. Patrolman George F. Fahy, employed by the defendants, talked to the decedent about 11:10 p. m. on May 28, 1943, while on the 8—10 platform. Decedent was next seen at about 11:45 p. m. on track 9, having been killed by a freight train. No one saw the accident and no one saw the decedent between 11:10 p. m. and 11:45 p. m. There was a thirty-five minute interval between the time when Fahy saw the decedent on platform 8—10 and the time that he was killed on track 9 which is at the 7—9 platform. With some difficulty the decedent informed Fahy that he was going to New York. Decedent was on the easterly platform 8—10 and the New York trains were on the 9—7 platform. Fahy advised the decedent to proceed to the 9—7 platform and walked along with him to the stairs on the easterly side of the 8—10 platform and directed the decedent to go down the stairway into the subway (a passageway under the tracks)—there are stairs leading to the various platforms—and turn to the right and then go upstairs to the track marked 9—7. He saw the decedent descend the stairs and walk in the direction of track marked 9—7. That was the last time that Fahy saw him alive.

Fahy did not testify, therefore the jury did not have an opportunity to observe him; this would have been helpful as it is so difficult to judge the credibility of a witness upon a mere typewritten page. There was received in evidence a statement (Plaintiff's Exhibit 7) made by Fahy to Army officers, who were investigating the cause of the decedent's death, on May 29, 1943, the day after the accident. The pertinent portions of the statement are as follows:

"Mr. Elliot to Mr. Fahy

"Q. Your occupation is patrolman? A. Yes, sir.

"Q. What hours do you work, Mr. Fahy? A. 4.00 to 12.00.

"Q. Were you working yesterday? A. Yes, sir.

"Q. Do you know anything about the injury to a soldier about 11:45 p. m. last night on track 9 in the station? A. I think I do.

"Q. Will you tell us please what knowledge you have of the facts leading up to it? A. I was on platform 8—10. There was two trains in there, the State of Maine and the Montrealer. I cover both of them every night, and it struck me funny, 168 pulls out and 124 also at 11:09—that was a little late. So I always make it a habit to clean the platform to make sure no passengers are left after every train pulls out. This is a hard story to tell. I couldn't figure it out when I got home—I sits up almost all night doing it. Well I come across this soldier sitting on track 8. He was looking towards tower 75, in the west direction, here on track 8 on the bench. There was nobody around so I went over to this soldier and I says, 'Where are you going, son?' And he still had that dazed look towards the west. So he didn't answer right away. I am telling this story just as it is—I may be a little bit slow about it. I says, 'Are you waiting for someone?' He attempted to talk and didn't —he didn't say a word. So I says, 'Well, son, there are no more trains coming on these tracks until 2.45 in the morning—the 3 o'clock for Boston.' I says, 'You waiting for somebody, the trains are all gone until 3 o'clock.' And he still sat there in that peculiar way and I thought probably he had a few drinks. I stepped up a little close. I got a look at the lad and I got a good smell of him. There was no liquor on him. So I said to him, 'Where are you going, son?' So after a little time he said, 'I want to take a train.' I says, 'Where are you going? Can't you tell me where you're going?' And I still noticed him in that same mood so I says, 'Tell me where you are going. Maybe I can help you out.' 'Oh, New York.' I says, 'You are on the wrong tracks for New York trains,' so I says, 'All New York trains on 9—7 going westward.' So he sat there probably another few minutes so then he stood up. So I walked right along with him to the stairs on the east side of the platform to the stairway and I put my hand on his back and said, 'Now, son, go down this stairway and turn to the right. Take the tracks marked 9—7' And I says, 'You will find you probably missed the train the comes in at 11 o'clock, that is 97, most likely you miss that.' With that I pulled out my watch. It was 12 minutes after 11. I had a good look at the boy. Of course he had a hat on. He looked very neat. His uniform was the light uniform and that wing was on his shoulder and he had a little insignia or something on his hat and he had brown shoes well polished. As I remember it he never thanked me. The only words he said was that he wanted to take a train and 'New York.' So he went down the subway and he got to the stairs I turned away because I have another job that comes in at 12.45, 382 train. So I decided about, I should say, 16 minutes to 12 to come to my office. I left platform 8 and come down the stairway through the subway and stopped at the ticker to see how 382 was.

"Q. That ticker you speak of is that in the subway? A. In the station.

"Q. On the station side of the stairway to the 7—9 platform? A. That is it exactly. And I stopped there to read it. While I was there there was a commotion or running and I turned around and seen two patrolmen running up the stairway to 9—7. I seen them running up and one called, 'Come on Fahy. Somebody is laying on the tracks.' I rushed up to the tracks at 9—7 and I got to the top of 9—7 at the west stairway and on the platform and to my right I seen this body laying there on the tracks because it got me for a few minutes. It took a little wind out of me and well I finally come out of it and I keeps the passengers down in the subway. I wouldn't let anybody up. The stretcher was called and I assisted to put this body on the stretcher. And I took a hold by the arms and the patrolman told me to take another hold of him, and Assistant Superintendent Elliot was there assisting us also. I put the lad up and went down probably five or six yards and picked up his leg and I noticed his shoe particularly, and then I took a good look at this boy laying there without the hat and I could almost swear it was the same fellow I was talking to 25 minutes ago.

"Q. Is that all you did? A. Yes, I noticed, as I said, I took a good look. Of course his eyes was closed and he was all colored up with that dark dust being pushed up there with that freight. I got home and that night and I thought it over. I noticed that emblem on his shoulder the

wing. I said, 'Gee, I am certain I was talking to that fellow.' I noticed he hadn't much to say—he must have had an awful lot on his mind. There was something wrong somewhere.

"Q. When you found this man on the 8—10 platform was he sitting on the bench by the subway stairs? A. On track 8 side.

"Q. And moving? A. You see it is a long bench and he was on the far end on the east end of the chair and he was just sitting like this (demonstrates) and looking off in that direction. When I approached him he didn't even know I was there.

"Q. Did you ask him after he had answered going to New York or something, did you ask him if he had a ticket? A. No, sir, I didn't. I presumed he was on the wrong track at the time and never did ask if he had a ticket—I never thought of it. I don't know—there was something the trouble with the fellow.

"Q. He was very slow to answer at all? A. As if I weren't there. He did eventually get up. * * *

"Lt. Hardwick

"Q. Did you see anything peculiar about this man you were talking to—about the way he talked or the way he walked. Did he walk fast? A. He was in no hurry to go. * * *

"Mr. Doolan

"Q. After you saw the boy leave the 8—10 platform and go down into the subway, you went down into the subway to look at the ticker, did you see the boy at any time from the time he left the 8—10 platform until you saw the injured person? A. No, sir, not until I saw the injured person. * * *

"Lt. Stein

"Q. Did he stagger or walk peculiarly down the stairs? A. He was going down the stairs easy.

"Q. He didn't hold on to the side rails? A. He went right down the stairs.

"Q. Slow? A. He was in no hurry. * * *

"Lt. Hardwick

"Q. You don't think he was drinking? A. No, I deliberately stuck my nose in him. That's when I had a look at his shoes.

"Q. How long had you talked to him? A. I was with him about 3 minutes.

"Q. There was nobody else out there with you? A. No, sir. Not a soul on the platform. * * *

"Mr. Elliot

"Q. Did you see this man down to the subway? A. No, sir. I stood at the top.

"Q. You have no knowledge that he went to the 7—9 stairway? A. No, sir. He turned towards there.

"Q. Toward that direction? A. Yes, sir."

The memorandum submitted by the defendants "is limited to a discussion of the question of proximate cause".

Plaintiff's case was based upon the claim that the decedent was fatally injured because of his inability to take care of himself due to his mental condition, and that the defendants knew or should have anticipated the decedent's unfitness to take care of himself.

▮ There was evidence upon which the jury could have inferred the decedent's mental unfitness and the defendants' knowledge thereof. The railroad was a common carrier and the jury could have found that the decedent was in such a mental condition that he was unable to take care of himself and that the defendants' patrolman had knowledge thereof. Under such circumstances it was the defendants' duty, acting through their patrolman, to guard the decedent against dangers which might reasonably be expected to occur under the circumstances. See Di Rossi v. Connecticut Co., 122 Conn. 372, 188 A. 926; Dwyer v. Connecticut Co., 103 Conn. 678, 131 A. 838; Dokus v. Palmer, 130 Conn. 247, 33 A.2d 315. This is the Connecticut rule, also the New York rule. See O'Hanlon v. Murray, 285 N.Y. 321, 34 N.E.2d 339; Fagan v. Atlantic Coast Line R. Co., 220 N.Y. 301, 115 N.E. 704, L.R.A.1917E, 663.

▮ This case depends upon circumstantial evidence. Sometimes circumstantial evidence is more reliable than direct evidence. The jury could have inferred that the decedent was unable to take care of himself and that Fahy knew this and, instead of affording him some protection under the circumstances, permitted him to go on platform 9—7, and that Fahy's negligence was the proximate cause of the decedent's death. Frankly, this Court, if it were the trier of the facts, would unhesitatingly find for the defendants; however that is not the test on the motion for a di-

439

rected verdict. This Court can not substitute its judgment for that of the jury.

Motion for a directed verdict in favor of the defendants will be denied.

Settle order on notice.